IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMIL ALPERIN, et al., | No. C-99-04941 MMC |
| Plaintiffs, | **ORDER GRANTING DEFENDANT IOR'S MOTION TO DISMISS FOURTH AMENDED COMPLAINT** |
| v. | |
| VATICAN BANK, et al., | (Docket No. 272) |
| Defendants. / | |

Before the Court is the motion to dismiss plaintiffs' Fourth Amended Complaint filed March 20, 2006 by defendant Istituto per le Opere di Religione ("IOR"), seeking dismissal of the claims asserted against IOR for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act and for lack of standing. Plaintiffs have filed an opposition to the motion; IOR has filed a reply. Having considered the papers filed in support of and in opposition to the motion, the Court rules as follows.

**BACKGROUND**

Plaintiffs consist of both individual and organizational plaintiffs, as well as a purported class of all Serbs, Jews, Roma, and former Soviet Union citizens and their heirs and beneficiaries who suffered monetary and/or property losses assertedly caused by the Independent State of Croatia ("NDH") during the period from April 1941 through May 1945. (See Fourth Amended Complaint ("4AC") ¶¶ 1, 45-73.) The defendants are IOR and the

Order of Friars Minor ("OFM").  (See 4AC ¶¶ 74-85.)

According to plaintiffs, defendants "accepted, concealed, hypothecated, laundered, retained, converted and profited from assets looted by the Ustasha Regime during April 1941 through May 1945 and deposited in, or converted, concealed, hypothecated, trafficked, credited, pledged, exchanged, laundered or liquidated through, the IOR, and OFM after the demise of the NDH in May 1945." (See id. ¶ 8.)  Specifically, plaintiffs allege that their property was taken by the Ustasha Regime and added to the Ustasha Treasury.  (See id. ¶¶ 41-44.)  Plaintiffs allege that "[m]ore than 200 million Swiss francs" from the Ustasha Treasury were "transferred to Vatican City and the College of San Girolamo Degli Illirici and then to the IOR for conversion."  (See id. ¶ 154.)  Plaintiffs further allege that "[i]n 1948, 2,400 kilos of Ustasha Treasury gold was moved from the IOR to Swiss bank accounts."  (See id. ¶ 155.)  Additionally, plaintiffs allege that jewels, gold coins, and gold jewelry from the Ustasha Treasury were converted after the end of World War II by IOR and OFM before being transferred to Swiss bank accounts.  (See id. ¶ 159.)

Plaintiffs further allege that a portion of the Ustasha Treasury was "transferred, credited, and exchanged into the IOR's gold trading program" in the United States.  (See id. ¶ 39.)  Plaintiffs allege that IOR deposited gold from the Ustasha Treasury in the Federal Reserve Bank in New York and the Republic Bank of New York through the 1960's.  (See id. ¶¶ 37, 166.)  Plaintiffs also allege that "[f]unds from the Ustasha Treasury laundered by IOR were used to set up the publishing and commercial activities of the Croatian Publishing House Croatia and the Croatian Historical Institute . . . and to expand the existing operations of the Danica newspaper, the Croatian Franciscan Custody of the Holy Name, the Franciscan Printery, the Croatian Almanac, and the Croatian Catholic Messenger newspaper, all in Chicago under the direction of OFM."  (See id. ¶ 35.)  Plaintiffs claim that IOR "profited from Ustasha Treasury transactions involving banks in various European and South American countries" and enhanced its position "as a post war gold trader on both public and private markets.  (See id. ¶¶ 162, 165.)

By the instant complaint, plaintiffs assert causes of action against defendants for an

accounting, conversion, unjust enrichment, restitution, and violations of international law. (See id. ¶¶ 182-201.)

**LEGAL STANDARD**

A motion to dismiss for lack of subject matter jurisdiction is brought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 12(b)(1). When ruling on a facial attack under Rule 12(b)(1), the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." See Warth v. Seldin, 422 U.S. 490, 501 (1975).[1]

**DISCUSSION**

IOR moves to dismiss the claims against it on the grounds it is immune from suit under the Foreign Sovereign Immunities Act ("FSIA") and that plaintiffs lack standing.

**A.    Foreign Sovereign Immunities Act**

The FSIA "provides the 'sole basis' for obtaining jurisdiction over a foreign sovereign in the United States." See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992). The district courts have "original jurisdiction . . . of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity" under the FSIA or any applicable international agreement.

---

[1] The moving party may make either a facial or a factual attack on the pleadings. See Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004). In a facial attack, the moving party "'asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.'" Id. (quoting Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004)). In a factual attack, the moving party challenges the truth of the allegations with extrinsic evidence such as affidavits. Id. In a factual attack, the opposing party must respond with affidavits or other evidence to satisfy its burden of establishing subject matter jurisdiction. Id. Here, IOR has submitted declarations in support of its argument that it is a foreign sovereign, but it has not submitted extrinsic evidence with respect to whether it falls within any of the FSIA's exceptions to sovereign immunity. Plaintiffs have not submitted any evidence in opposition, and have treated IOR's motion as a facial attack, arguing that the allegations are sufficient on their face to establish jurisdiction under the FSIA's exceptions. IOR likewise characterizes its motion as a facial attack, and makes no argument that plaintiffs are required to respond with evidence to satisfy their burden of establishing jurisdiction. (See Motion at 1:7-10.) Because IOR's extrinsic evidence is limited to the issue of its status as a foreign sovereign, and because the parties have not argued the issue, the Court will assume plaintiffs are not required to respond with extrinsic evidence to survive the motion, and, accordingly, will analyze the sufficiency of the complaint on its face.

See 28 U.S.C. § 1330(a); see also 28 U.S.C. § 2604 (providing "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter"). The FSIA applies retroactively to all conduct, including conduct occurring before its enactment. See Republic of Austria v. Altmann, 541 U.S. 677, 697 (2004).

The defendant "bears the burden of establishing its immunity, including the burden of proof that no exception applies." See Phaneuf v. Republic of Indonesia, 106 F.3d 302, 306 (9th Cir. 1997). The defendant must first establish a prima facie case of sovereign immunity, which gives rise to a presumption of immunity, by demonstrating that it is a foreign state within the meaning of the FSIA. See id. If the defendant establishes a prima facie case of immunity, the burden shifts to the plaintiff to establish that an exception applies. See id. at 307. If the plaintiff meets its burden, the defendant then bears the burden of showing that the exception does not apply. See id.

### 1. Agency or Instrumentality

IOR argues that it is an agency or instrumentality of the Holy See, which plaintiffs concede is a foreign sovereign. (See Opp. at 1:23-24.) A foreign state "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." See 28 U.S.C. § 1603(a). An agency or instrumentality of a foreign state is any entity that is (1) "a separate legal person, corporate or otherwise"; (2) "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof"; and (3) "neither a citizen of a State of the United States . . . nor created under the laws of any third country." See 28 U.S.C. § 1603(b). As plaintiffs concede (see Opp. at 2:24-25), IOR is a separate legal person and is not a citizen of the United States or created under the laws of any third country, (see Caridi Decl. ¶¶ 35, 47). Consequently, the issue that remains is whether IOR is an organ of the

foreign state. See 28 U.S.C. § 1603(b)(2).[2]

To determine whether an entity is an organ, "courts consider whether the entity engages in a public activity on behalf of the foreign government." See EIE Guam Corp. v. Long Term Credit Bank of Japan, 322 F.3d 635, 640 (9th Cir. 2003). In making this determination, courts examine the following factors: (1) "the circumstances surrounding the entity's creation"; (2) "the purpose of its activities"; (3) "its independence from the government"; (4) "the level of government financial support"; (5) "its employment policies"; and (6) "its obligations and privileges under state law." See EIE Guam Corp., 322 F.3d at 640.

### a. Circumstances surrounding IOR's creation

The first factor looks to whether the entity was created by public law. See, e.g., id. (finding organ status where entity created pursuant to laws enacted by Japanese Diet); Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect, 89 F.3d 650, 655 (9th Cir. 1996) (finding organ status where entity created by Mexican Constitution, Federal Organic Law, and Presidential Proclamation). IOR is a "public juridic person" under canon law. (See Declaration of Professor Settimio Carmignani Caridi ("Caridi Decl.") ¶¶ 25-26.)[3] IOR's status as a public juridic person was established on March 1, 1990, pursuant to the Chirographum quo nova ordinatio datur Organismo Istituto per le Opere ("1990 Chirograph")[4] and Adnexum Statuto, Istituto per le Opere di Religione ("1990

---

[2] The relevant inquiry is whether IOR is an agency or instrumentality "at the time the lawsuit is filed," as opposed to "the time of the alleged wrongdoing." See Patrickson v. Dole Food Co., 251 F.3d 795, 805 (9th Cir. 2001).

[3] A "juridic person" is a "fictitious" rather than a "natural" person. (See id. ¶ 25.) A "public juridic person" is an entity that "is created by the specific grant of the competent authority." (See id. ¶ 27.)

[4] "A chirograph is a traditionally handwritten instrument through which the Pontiff expresses his will. In the Holy See's legal system, the papal chirograph is law." (See Caridi Decl. ¶ 32 n.1.)

5

1 Statuto")[5] issued by Pope John Paul II, the governing authority of the Holy See.[6]  (See
2 Caridi Decl. ¶ 32.)  Accordingly, the circumstances surrounding IOR's creation, and, in
3 particular, its creation as a juridic person by the Pope, support a finding of organ status.

### b. Purpose of IOR's activities

The second factor focuses on whether the entity serves a public purpose or whether it acts as an independent commercial enterprise to maximize its own profits.  See, e.g., EIE Guam Corp., 322 F.3d at 640 (finding organ status where entity's purpose was to carry out national policy to revitalize Japanese financial system); Kelly v. Syria Shell Petroleum Dev B.V., 213 F.3d 841, 848 (9th Cir. 2000) (finding organ status where entity's purpose was to develop and explore Syria's mineral resources); but see, e.g., Patrickson v. Dole Food Co., 251 F.3d 795, 808 (9th Cir. 2001) (finding no organ status where entity, created to exploit resources owned by Israeli government, was "independent commercial enterprise[ ]" acting to "maximize profits rather than pursue public objectives").

According to the 1990 Statuto, IOR's purpose is to "provide custody and administration of movables and immovables transferred or entrusted to the same institute for the purpose of works of religion and charity."  (See Caridi Decl. ¶ 37; see also Declaration of Jeffrey S. Lena ("Lena Decl.") ¶ 4 & Ex. A (Piccolo Decl., 1990 Bylaws Translation ("Bylaws Translation")).)  The 1990 Statuto authorizes IOR to act "as a fiduciary of the deposited funds for designated pious purposes, and as an autonomous pious foundation that directly carries out the charitable purposes of the Holy See and the State of

---

[5]Caridi states that the 1990 Statuto is the "internal governing regulations" of IOR. (See Caridi Decl. ¶ 32.)

[6]Plaintiffs argue the Caridi Declaration should not be given any weight because IOR has failed to provide translated copies of the documents relied upon by Caridi.  IOR did, however, provide copies and translations of the primary sources Caridi relied upon in his declaration, in particular, the 1990 Chirograph and the 1990 Statuto.  (See Lena Decl., filed June 30, 2006, Ex. A.)  Plaintiffs further argue that Caridi's declaration "should be accorded little if any weight" because "IOR is asking the Court to enforce religious law - canon and ecclesiastical - in a secular property dispute with non-members of the Roman Catholic religion."  (See Opp. at 3:9-11, 3:26-28.)  IOR is not, however, asking the Court to enforce religious law; rather, it is presenting its governing laws to establish it is an agency or instrumentality of a foreign state as defined by the FSIA.

Vatican City." (See Caridi Decl. ¶ 38; see also Lena Decl. Ex. A (Bylaws Translation).) IOR is not authorized to retain profits. (See Caridi Decl. ¶ 53.) Accordingly, IOR serves a public purpose of the Holy See and is not an "independent commercial enterprise"; consequently, this factor supports a finding of organ status.

### c. Independence from the Holy See

The third factor focuses on the entity's structure. The Courts of Appeals have held that an entity is an organ of the foreign state where the entity's board is comprised of high-ranking government officials. See, e.g., Kelly, 213 F.3d at 848 (finding organ status where board members "have invariably been high-level Syrian government officials"); Patrickson, 251 F.3d at 808 (finding no organ status where entity was "not run by government appointees"). Here, the Cardinals' Commission, the highest administrative level of IOR, is comprised of five high-ranking government officials, all appointed by the Holy See. (See Caridi Decl. ¶¶ 41-42; see also Lena Decl. Ex. A (Bylaws Translation).) Plaintiffs argue, however, that the Holy See lacks control over IOR because the Cardinals' Commission does not conduct the day-to-day activities of IOR. Although the Cardinals' Commission does not itself oversee IOR's day-to-day activities, the Commission appoints and removes members of the Oversight Council, including the IOR's president (see Caridi Decl. ¶ 43; see also Lena Decl. Ex. A (Bylaws Translation)), who, as plaintiffs concede, is responsible for IOR's day-to-day operations (see Opp. at 7:25-27). Furthermore, an entity "may be an organ of a foreign state even if it has some autonomy from the foreign government." See EIE Guam Corp., 322 F.3d at 640. Simply "because 'the [state] is not directly involved in the day-to-day activities of [the entity] does not mean that it is not exercising control over the entity.'" See id. (alteration in original) (quoting Gates v. Victor Fine Foods, 54 F.3d 1457, 1461 (9th Cir. 1995)). Moreover, IOR "cannot change its rules of internal governance without permission of and final approval by the sovereign," further indicating a lack of independence from the Holy See. (See Caridi Decl. ¶ 36; see also Lena Decl. ¶ 4 & Ex. A (Piccolo Decl., 1990 Chirograph Translation).) Accordingly, IOR's lack of independence from the Holy See supports a finding of organ status.

### d. Financial support from the Holy See

The fourth factor focuses on whether the entity is funded by the government. See, e.g., EIE Guam Corp., 322 F.3d at 640 (finding organ status where entity funded by government and compensated by government for all losses); California v. NRG Energy, Inc., 391 F.3d 1011, 1026 (9th Cir. 2004) (finding no organ status where entity received no financial support from government). Although IOR's current source of funding is not apparent from the record, IOR was originally funded by the Holy See. (See Caridi Decl. ¶ 33.) Moreover, although IOR has not presented evidence that the Holy See compensates it for its losses, IOR, as previously noted, is not authorized to retain profits. (See id. ¶ 53.) Accordingly, the evidence with respect to IOR's receipt of financial support from the Holy See supports a finding of organ status.

### e. IOR's employment policies

The fifth factor looks to whether the entity employs civil servants. See, e.g., Corporacion Mexicana, 89 F.3d at 656 (finding organ status where entity employed only public servants); Patrickson, 251 F.3d at 808 (finding no organ status where entity's employees "were not treated as" civil servants). IOR has not presented evidence to show that its employees are civil servants. An entity, however, "may be an organ of a foreign state for purposes of the FSIA even if its employees are not civil servants"). See EIE, 322 F.3d at 641.

### f. IOR's obligations and privileges under state law

The final factor considers the entity's obligations and privileges under state law, including whether it performs any exclusive activities for the government, see, e.g., Corporacion Mexicana, 89 F.3d at 655 (finding organ status where entity charged with exclusive responsibility of refining and distributing government property); Kelly, 213 F.3d at 848 (finding organ status where entity had exclusive right to explore and develop Syria's petroleum reserves), and whether the entity enjoys immunity from suit, see, e.g., NRG, 391 F.3d at 1026 (finding no organ status where entity not immune from suit).

Here, IOR performs activities exclusively for the foreign state, including routing

payments between Holy See agencies. (See Caridi Decl. ¶¶ 49, 51.) Moreover, although there is no evidence that IOR is immune from suit within the Holy See, IOR is immune from suit in Italy. (See id. ¶ 35.) Accordingly, IOR's obligations and privileges under state law support a finding that IOR is an organ of the Holy See.

### g. Summary of IOR's status as a foreign sovereign

In sum, the circumstances surrounding IOR's creation, the purpose of its activities, its level of independence from the Holy See, its level of financial support from the Holy See, and its obligations and privileges under state law all demonstrate that IOR is an organ of the Holy See. Although there is no evidence that IOR's employees are civil servants, the other factors are sufficient to support a finding that IOR is an organ of the Holy See. Accordingly, IOR has established a prima facie case of sovereign immunity, and will be immune from suit unless an exception applies. See Phaneuf, 106 F.3d at 306-07.

## 2. Exceptions

Because IOR has established a prima facie case of sovereign immunity, the burden shifts to plaintiffs to show that an exception applies. See id. Plaintiffs contend IOR is not entitled to immunity under the commercial activity exception set forth in § 1605(a)(2), the international takings exception set forth in § 1605(a)(3), or the tort exception set forth in § 1605(a)(5).

### a. Commercial activity exception

The commercial activity exception provides three situations in which a foreign state will not be immune from suit, specifically, where the action is based upon (1) "a commercial activity carried on in the United States by the foreign state"; (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." See 28 U.S.C. § 1605(a)(2). Plaintiffs contend the first and third clauses are applicable herein. (See 4AC ¶ 34; see also Opp. at 9-14.)

In order to establish jurisdiction under the first clause, the commercial activity on

which the plaintiff relies "'must be the activity upon which the lawsuit is based.'" See Sun v. Taiwan, 201 F.3d 1105, 1109 (9th Cir. 2000) (quoting America West Airlines, Inc. v. GPA Group, Ltd., 877 F.2d 793, 796 (9th Cir. 1989). The entire case need not rest on the commercial activity of the defendant, but the plaintiff must show that "'an element of the . . . claim consists in conduct that occurred in commercial activity carried on in the United States.'" Id. (quoting Sugimoto v. Exportadora De Sal, S.A. De C.V., 19 F.3d 1309, 1311 (9th Cir. 1994)). Here, plaintiffs do not identify the commercial activity within the United States that would satisfy the requirements of the first clause. Rather, they argue only that IOR's conversion and money laundering activities, which occurred outside the United States, had a direct effect inside the United States because IOR used funds from the Ustasha Treasury to set up a publishing house and gold accounts in the United States. (See 4AC ¶ 34-37, 152-160; see also Opp. at 9:18-20.) Assuming such activities qualify as "commercial activity" within the United States, the instant action is not based thereon, but rather is based on IOR's alleged conversion and money laundering, which took place outside the United States. See Sun, 201 F.3d at 1110 (holding defendants' promotional and administrative activities within United States not relevant with respect to jurisdiction under FSIA where underlying claim of negligence was failing to supervise student in Taiwan). Accordingly, the first clause, requiring that an action be "based upon a commercial activity carried on in the United States by the foreign state" is not applicable. See 28 U.S.C. § 1605(a)(2).

With respect to the third clause, plaintiffs allege that "[p]ursuant to 28 U.S.C. [§] 1605(a)(2), there is an exception to sovereign immunity as the conversion, money laundering, and retention of the plunder of plaintiffs' property by the IOR has had a direct commercial effect in the United States and California." (See 4AC ¶ 34.) Plaintiffs allege that the "[f]unds from the Ustasha Treasury laundered by IOR were used to set up the publishing and commercial activities of the Croatian Publishing House Croatia and the Croatian Historical Institute" in Chicago and to expand various existing newspaper operations also in Chicago. (See id. ¶ 35.) Plaintiffs further allege that "IOR possessed

10

and/or possesses gold accounts in the United States and the private and public gold markets in the United States were directly effected [sic] by gold credits and transfers made possible by the additional gold supplied the IOR from the Ustasha Treasury." (See id. ¶ 37.)

Under the third clause, IOR will not be immune from suit if the instant action is based upon an act that (1) was committed outside the United States; (2) was taken in connection with a commercial activity of IOR outside the United States; and (3) caused a direct effect in the United States. See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992). Although plaintiffs have alleged the instant action is based on conduct — conversion and money laundering — committed outside the United States, (see 4AC ¶¶ 152-160), plaintiffs have not shown IOR's alleged conduct was done in connection with a "commercial activity" outside the United States.

A "commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act." See 28 U.S.C. § 1603(d). "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." Id. When a foreign sovereign acts "not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." See Weltover, 504 U.S. at 614. Plaintiffs contend, without citation to authority, that "[t]he [c]rimes of IOR were [c]ommercial [a]ctivity." (See Opp. at 12:3-16.) Plaintiffs do not explain how IOR's alleged criminal acts are synonymous with that of a "private player" in the market.

Even if plaintiffs were to establish that IOR's alleged conversion was done in connection with a commercial activity, however, plaintiffs have failed to show a direct effect in the United States. An effect is direct "if it follows as an immediate consequence of the defendant's activity," see Weltover, 504 U.S. at 618 (internal quotation and citation omitted), and is not a "secondary or incidental[ ] result[ ]" of the defendant's actions, see Corzo v. Banco Cent. De Reserva Del Peru, 243 F.3d 519, 525 (9th Cir. 2001) (holding

effect on U.S. companies not direct where defendant's conduct caused "cutoff of cash-flow" that caused plaintiff to breach contracts with said companies). Courts "often look to the place where legally significant acts giving rise to the claim occurred" to determine the place where a direct effect is likely to be located. See Adler v. Fed. Republic of Nigeria, 107 F.3d 720, 727 (9th Cir. 1997) (internal quotation and citation omitted).

Here, plaintiffs contend the "direct effect" in the United States was IOR's "publishing activities in Chicago" and IOR's "enhance[d] . . . position as a gold trader." (See Opp. at 12:18-19, 13:8-9.) Any such effect, however, has no legal significance with respect to plaintiffs' claim that IOR converted their property in Vatican City in 1946. A mere receipt of a collateral financial benefit in the United States is not a direct effect. Cf. Adler, 107 F.3d at 726-27 ("[M]ere financial loss . . . in the U.S. is not, in itself, sufficient to constitute a 'direct effect.'") Moreover, the asserted effects occurred years after IOR's alleged conversion, and thus were not an "immediate consequence," see Weltover, 504 U.S. at 618, of the claimed wrongful conduct. According to plaintiffs, at least six years passed after IOR's alleged conversion in 1946 until the establishment of the publishing company in Chicago. (See 4AC ¶¶ 39, 146-147.) Further, plaintiffs concede there is a lapse of approximately fifteen years between IOR's alleged conversion in 1946 and IOR's alleged gold dealings in the United States. (See Opp. at 13:16-18.) The only authority plaintiffs cite in support of their argument is Altmann v. Austria, 317 F.3d 954 (9th Cir. 2002). That case, however, addressed only the "international takings" exception and thus did not involve an analysis of the "direct effect" requirement under the commercial activity exception. Accordingly, plaintiffs have failed to show the instant action is based on an "act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere" that "causes a direct effect in the United States." See 28 U.S.C. § 1605(a)(2).[7]

### b. International takings exception

---

[7] In light of the foregoing, the Court does not reach IOR's argument that the Court is precluded from analyzing plaintiffs' claim under the commercial activity exception because the claim is "in essence" one for an unjust taking of property, properly analyzed under the international takings exception. (See Motion at 10:9-12:10.)

Plaintiffs next argue that IOR is not entitled to immunity under § 1605(a)(3), the international takings exception. Section 1605(a)(3) provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

See 28 U.S.C. § 1605(a)(3).

IOR argues that plaintiffs fail to meet the exception for a number of reasons, including that plaintiffs have claimed only "intangible" property rights, that plaintiffs have not alleged facts showing the taking of their property was in violation of international law, and that plaintiffs have not satisfied the local remedies rule. The Court need not reach all of the issues raised by IOR, however, because plaintiffs have failed to establish an essential element under either clause of the exception. Under the first clause, plaintiffs have failed to allege that their property or property exchanged for it is in the United States in connection with a commercial activity in the United States. Under the second clause, although plaintiffs allege that IOR owns or operates their property, plaintiffs fail to allege that IOR is engaged in a commercial activity in the United States.

Plaintiffs argue that the jurisdictional nexus is satisfied under the first clause because parts of the Ustasha Treasury were exchanged for gold and then transferred to the United States through IOR's gold trading program, which included trading with the Federal Reserve Bank and the Republic Bank of New York through the 1960's. (See 4AC ¶¶ 37, 39, 166; Opp. 14:23-25, 18:21, 19:5-17.) Plaintiffs have not alleged, however, that <u>their</u> property was exchanged for gold and then transferred to the United States, only that an unidentified "portion" of the Ustasha Treasury was transferred. Further, plaintiffs concede that the gold involved in IOR's alleged transfer may no longer be present in the United States. (See Opp. 18:21.) Plaintiffs' argument thus rests on three levels of speculation: first, that their personal property might have been among the unidentified items

that IOR allegedly exchanged for gold; second, that the gold for which their property was exchanged might have been among the gold transferred to the United States as part of IOR's gold trading program; and third, that the transferred gold might still be present in the United States, forty years after IOR's last alleged gold transaction in the United States. Plaintiffs are correct that the Court is required to accept as true the factual allegations in the complaint. See Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003). Plaintiffs, however, have not alleged, as required under the FSIA, that their property or property exchanged for it is within the United States, but only that the property might be within the United States. Such allegations are too speculative to support the requisite jurisdictional nexus. See Crist v. Republic of Turkey, 995 F. Supp. 5, 11 (D.D.C. 1998) ("Plaintiffs' mere allegation that the proceeds derived from their real property located in Cyprus are now somehow connected to some unidentified commercial activity . . . in the United States is simply not sufficient to satisfy the jurisdictional requirements under the FSIA.").

With respect to the second clause, plaintiffs allege that IOR "retained" some of their property after converting other property for the benefit of the exiled Ustasha. (See 4AC ¶¶ 42, 44, 191.)[8] Assuming, arguendo, such conclusory allegation suffices to plead current ownership by IOR, plaintiffs nonetheless fail to allege IOR is currently engaged in a commercial activity in the United States. See 28 U.S.C. § 1605(a)(3). Plaintiffs argue that IOR's gold trading program in the United States constitutes a commercial activity. (See Opp. at 19:6-17.) Plaintiffs acknowledge, however, that IOR's last gold transaction in the

---

[8] Relying on Vencedora Oceanica Navigacion, S.A. v. Companie Nationale Algerienne de Navigation, 730 F.2d 195, 204 (5th Cir. 1984), IOR argues plaintiffs must allege not only possession or control but also that their property is being used by IOR for its own benefit. The legislative history on which Vencedora based its holding, specifically, a committee report, does not make reference to such a requirement, however. Although the report states that "a taking in violation of international law" includes "nationalization" or "expropriation" of property without compensation, see 1976 U.S. Code Cong. & Ad. News 6604, 6618, the use of such terms does not imply a requirement that the foreign state use the property for its own benefit. See Black's Law Dictionary 1052 (8th ed. 2004) (defining "nationalize" as to "bring (an industry) under governmental control or ownership"); Id. at 621 (defining "expropriation" as "[a] governmental taking or modification of an individual's property rights, esp. by eminent domain").

United States occurred, at the latest, in the 1960's. (See 4AC ¶ 166.)[9] Because plaintiffs fail to allege IOR is currently engaged in any commercial activity in the United States, plaintiffs have failed to establish the jurisdictional nexus under the second clause of § 1605(a)(3).

### c. Tort exception

Plaintiffs argue that the tort exception applies because "[s]ome of the Ustasha Treasury was converted in the United States through the IOR gold trading program." (See Opp. at 19:20-21.) Under the tort exception, a foreign state is not immune from suit in any case "not otherwise encompassed in [the commercial activity exception], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." See 28 U.S.C. § 1605(a)(5). Section 1605(a)(5) further provides: "[T]his paragraph shall not apply to": (1) "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused" or (2) "any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." See id.

The tort exception applies when both the injury complained of and the tortious act or omission occur in the United States. See Olsen v. Gov't of Mexico, 729 F.2d 641, 645 (9th Cir. 1984). Although all of the tortious conduct need not occur in the United States, "at least one entire tort" must occur in the United States. See id. at 646.

Plaintiffs concede that the gold, after being looted, was "initially converted in 1946 through the machinations of IOR in Vatican City," (see Opp. at 19:24-25), but contend that,

---

[9] Plaintiffs allege that an individual identified as Fr. Dominik Mandic, set up, under OFM's direction, various publishing entities in Chicago that conduct ongoing business throughout the United States. (See 4AC ¶¶ 35, 36.) Plaintiffs do not allege, however, that IOR is in any way involved with these entities, other than to allege that the publishing businesses were originally established using funds from the Ustasha Treasury that had been laundered by IOR. (See id.)

15

by transferring the gold to the United States, "IOR reconverted the plaintiffs' property in the United States," (see id. at 19:25, 20:9-11). Plaintiffs argue that IOR's acts constitute a tort under California law, but provide no explanation as to why California law is applicable. Even under California law, however, plaintiffs have failed to show that "one entire tort" has occurred in the United States. See Olsen, 729 F.2d at 645. California Civil Code § 1712, which provides a cause of action for conversion, states in relevant part: "One who obtains a thing without the consent of its owner . . . must restore it to the person from whom it was thus obtained." As plaintiffs concede, IOR obtained the gold in the Vatican City. (See Opp. at 19:24-25.) Once IOR came into possession of the gold in the Vatican City, it did not "obtain" it again by transferring it to the United States. Plaintiffs provide no authority for their argument that IOR's "reconversion" is a tort under California law or the law of any other jurisdiction. Unlike the commercial activities exception, the tort exception does not confer jurisdiction where a tort committed outside the United States has a subsequent effect within the United States. See Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 441 (1989). Accordingly, plaintiffs have failed to show IOR's alleged tortious conduct occurred in the United States, and consequently, have failed to show the tort exception applies.[10]

### 3. Summary

Because IOR has established a prima facie case that it is an organ of a foreign sovereign, and because plaintiffs' allegations, even if taken as true, do not establish an exception to sovereign immunity applies, IOR's motion to dismiss plaintiffs' claims against IOR will be GRANTED. Consequently, the Court does not reach IOR's additional argument that plaintiffs lack standing.

---

[10] In light of the above ruling, the Court does not reach IOR's argument that plaintiffs' claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function," see 28 U.S.C. § 1605(a)(5)(A), or whether the Court is precluded from analyzing plaintiffs' claim under the tort exception because it is "in essence" a claim for an unjust taking of property, properly analyzed under the international takings exception, (see Motion at 10:9-12:10).

16

## CONCLUSION

For the reasons set forth above, IOR's motion to dismiss the claims against IOR for lack of subject matter jurisdiction under the FSIA is hereby GRANTED, and plaintiffs' claims against IOR are hereby DISMISSED.

**IT IS SO ORDERED.**

Dated: December 27, 2007

_____
MAXINE M. CHESNEY
United States District Judge