United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EMIL ALPERIN, et al.,

        Plaintiffs,

  v.

THE FRANCISCAN ORDER, et al.,

        Defendants.
_____/

No. C-99-4941 MMC

**ORDER GRANTING DEFENDANT ORDER OF FRIARS MINOR'S MOTION TO DISMISS**

      Before the Court is defendant Order of Friars Minor's ("OFM") motion, filed June 12, 2009, to dismiss plaintiffs' Sixth Amended Complaint ("6AC").  Plaintiffs have filed opposition, to which OFM has replied.  On July 27, 2009, the Court afforded plaintiffs an opportunity to file a sur-reply and ordered plaintiffs to show cause why the above-titled action should not be dismissed for lack of subject matter jurisdiction.  On August 14, 2009, plaintiffs filed a combined sur-reply and response to the Court's Order to Show Cause ("OSC").  On August 28, 2009, OFM filed a reply to plaintiffs' response to the OSC.[1]  Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.

**BACKGROUND**

      The instant action is brought by individual and organizational plaintiffs on behalf of themselves and a purported class of "all Serbs, Jews, Roma (Gypsies or Sinti-Romani),

---

[1]Additionally, on September 1, 2009, OFM filed a Statement of Recent Decision.

and certain former Soviet Union citizens and their legal heirs, successors, assignees, legatees, and beneficiaries," all of whom are alleged to have suffered monetary and/or property losses caused by the Independent State of Croatia ("Ustasha Regime") during the period April 1941 through May 1945. (See 6AC ¶¶ 1, 12.)

Plaintiffs allege that the sole remaining defendant, OFM,[2] is a hierarchical religious order with an administrative structure divided into geographically-based provinces, including "several in the United States," one of which, the Province of Saint Barbara, having headquarters in Oakland, California. (See id. ¶¶ 89, 91, 93.) Plaintiffs further allege that OFM, through its Minister General, controlled, from 1939 to 1969 and from 1977 to the present, the "Croatian Custody of the Holy Family of Chicago." (See id. ¶ 109.) Additionally, according to plaintiffs, in 1945, at the "behest" of OFM and two of its members, the formerly disbanded "Croatian Confraternity of Saint Jerome" ("Croatian Confraternity") was "reestablished . . . as part of an elaborate scheme to assist not just Croatians fleeing the fall of the Ustasha Regime but to provide material and financial support to the Ustasha Regime in exile." (See id. ¶ 105.)

Plaintiffs allege that their property was "seized, carried away and deposited, or otherwise added to the Ustasha Treasury by agents of the Ustasha Regime" (see id. ¶ 12), and that such property was "deliberately concealed, laundered, hypothecated, commingled and converted by [ ] OFM and its agents for the benefit of [OFM] and members of the former Ustasha Regime." (See id. ¶ 1.) In that regard, plaintiffs allege, funds from the Ustasha Treasury were smuggled outside Croatia, transferred to the Croatian Confraternity and two OFM officials, Fathers Dominik Mandic ("Mandic") and Krunoslav Draganovic ("Draganovic"), "and then to the Vatican City financial system and elsewhere for conversion." (See id. ¶ 136.) Plaintiffs further allege that "[a] significant portion of the post[-]war Ustasha Treasury was in the form of jewels and non[-]monetary valuables that required conversion by OFM or was retained by OFM and its agents to [be] used to

---

[2]On December 27, 2007, the Court dismissed plaintiffs' claims against defendant Instituto per le Opere di Religione. (See Order filed Dec. 27, 2007.)

2

promote the Ustasha cause and Croatian nationalism." (See id. ¶ 140.) Additionally, according to plaintiffs, "Ustasha Treasury assets were banked and converted by OFM using its accounts in the Vatican and elsewhere for use in Argentina, Brazil, Spain, Portugal[,] the United States, and Italy by the exiled Ustasha and [ ] Mandic-OFM controlled enterprises in Chicago." (See id. ¶ 141.)

In their 6AC, plaintiffs assert causes of action for an accounting, conversion, unjust enrichment, restitution, violations of international law, and replevin and safekeeping. (See id. ¶¶ 160-184.) By the instant motion, OFM argues that the entire action is subject to dismissal for lack of subject matter jurisdiction, lack of personal jurisdiction, insufficient service of process, lack of standing, and pursuant to the doctrine of forum non conveniens. The Court addresses first the question of subject matter jurisdiction.

## LEGAL STANDARD

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." Id. "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Id. Where, as here, the challenge to jurisdiction is a facial attack, the Court assumes the plaintiff's "allegations to be true and draw[s] all reasonable inferences in his favor." See Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004). Because federal courts are "courts of limited jurisdiction," however, the burden of establishing subject matter jurisdiction "rests upon the party asserting jurisdiction." See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).

## DISCUSSION

Plaintiffs contend subject matter jurisdiction exists herein based on diversity of citizenship, see 28 U.S.C. § 1332, the existence of a federal question, see 28 U.S.C. § 1331, and the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. As set forth below, the Court finds plaintiffs' have failed to show any of the above-referenced statutes provides

3

1 jurisdiction over the instant action.[3]

**A.  Diversity of Citizenship**

In their opposition to OFM's motion, plaintiffs initially took the position that the Court may exercise diversity jurisdiction over the instant action under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005). In response, OFM argued such statute is inapplicable, as it applies only to actions "commenced on or after" February 18, 2005, see CAFA § 9, 119 Stat. at 14, and the instant action was commenced in 1999. In their sur-reply and response to the Court's OSC, plaintiffs have abandoned their reliance on CAFA. (See Sur-Reply & Response to OSC at 10:22-25.) Plaintiffs contend diversity jurisdiction nonetheless exists under 28 U.S.C. § 1332(a).

Section 1332(a) provides a district court with jurisdiction where, inter alia, "the matter in controversy exceeds the sum or value of $75,000" and the action is between "citizens of a State and citizens or subjects of a foreign state." See § 1332(a)(2). The statute, however, requires "complete" diversity, and thus "does not encompass a foreign plaintiff suing foreign defendants." See Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A., 20 F.3d 987, 991 (9th Cir. 1994). Additionally, where there are aliens on both sides of the action, jurisdiction is not "salvage[d]" by the presence of a domestic plaintiff, see id., unless, pursuant to § 1332(a)(3), a diverse domestic defendant is present as well, see § 1332(a)(3) (providing for jurisdiction over action between "citizens of different States and in which citizens of a foreign state are additional parties"); Transure, Inc. v. Marsh & McLennan, Inc., 766 F.2d 1297, 1298-99 (9th Cir. 1985) (finding jurisdiction over suit brought by California and United Kingdom corporations against Delaware and South Africa corporations).

Here, the action is brought by both foreign and domestic plaintiffs (see 6AC ¶¶ 56-59, 76, 78-80, 83-88 (foreign plaintiffs); id. ¶¶ 60-75, 77, 81 (domestic plaintiffs)), and the

---

[3]Because the Court finds plaintiffs have failed to show subject matter jurisdiction exists over the instant action, the Court does not address herein OFM's arguments in support of dismissal on additional grounds.

sole remaining defendant, OFM, is a foreign entity (see id. ¶ 91 (alleging OFM "has its headquarters in Rome" and is recognized "under the laws of Italy")).  Plaintiffs, citing Bodner v. Banque Paribas, 114 F. Supp. 2d 117 (E.D.N.Y. 2000), argue that the presence herein of the foreign plaintiffs does not defeat diversity jurisdiction.  As OFM points out, however, Bodner involved two separate actions, one "filed on behalf of United States citizens," and the other by "aliens who assert[ed] their claims under the Alien Tort [Statute]," see id. at 121.  Moreover, the district court in Bodner did not purport to exercise diversity jurisdiction over either action; rather, the court found it had federal question jurisdiction over the action filed by the United States citizens, see id. at 127, and jurisdiction under the ATS over the action filed by the aliens, see id. at 128.

Accordingly, plaintiffs have failed to show the Court has jurisdiction over the instant action on the basis of diversity of citizenship.

**B.   Alien Tort Statute and Federal Question Jurisdiction**

The ATS provides district courts with jurisdiction "of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  See 28 U.S.C. § 1350.  The federal question statute, by contrast, provides district courts with jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States," see 28 U.S.C. § 1331.  Because an action for an international law tort "arises under federal common law," however, "where a case is brought by an alien for a 'tort only,' the jurisdictional burden under [the ATS] and § 1331 is the same."  See Sarei v. Rio Tinto, PLC, 487 F.3d 1193, 1201 n.5 (9th Cir. 2007), reversed in part on other grounds en banc, 550 F.3d 822 (9th Cir. 2008).

Here, plaintiffs contend they have alleged violations under both the law of nations and treaties of the United States.  The Court considers each of these contentions in turn.

**1.   Law of Nations**

The ATS "is a jurisdictional statute creating no new causes of action."  See Sosa v. Alvarez-Machain, 542 U.S. 692, 724 (2004).  As the Supreme Court has held, when the ATS was enacted by the First Congress, it applied to "the modest number of international

law violations with a potential for personal liability at the time," specifically, "violation of safe conducts, infringement of the rights of ambassadors, and piracy." See id. Although federal courts are not "precluded" from recognizing new causes of action under the statute, a court's "discretion" to do so is "restrained." See id. In that regard, the Supreme Court has required that "any claim based on the present-day law of nations [ ] rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of 18th-century paradigms [the Supreme Court] has recognized." See id.

Here, plaintiffs argue that OFM aided and abetted acts of "brigandage" committed by the Ustasha Regime, which acts, plaintiffs contend, constitute violations of both the 18th-century and present-day law of nations and are "the land-based equivalent of piracy." (See Opp'n at 18:24-19:1.)  In response, OFM argues that brigandage is not a violation of the law of nations cognizable under the ATS, and that, in any event, in this instance, the term encompasses only conduct alleged in those claims whose dismissal herein was affirmed by the Ninth Circuit. See Alperin v. Vatican Bank, 410 F.3d 532, 559 (9th Cir. 2005) (denominating certain claims as "War Objectives Claims"; finding such claims "present a nonjusticiable political question").  The Court, as set forth below, agrees that plaintiffs' claims of brigandage either do not constitute violations of the law of nations or are barred by the Ninth Circuit's opinion.

"Brigandage" has been defined as "[p]lundering and banditry carried out by bands of robbers." See Black's Law Dictionary 219 (9th ed. 2009) (noting "[p]iracy is sometimes called 'maritime brigandage'"). Plaintiffs argue that because piracy has been recognized as a violation of the law of nations, see Sosa, 542 U.S. at 715, brigandage likewise must be recognized as such. "Piracy," however, unlike "brigandage," is more narrowly confined and has been treated as a violation of the law of nations because of its interference with international trade and its commission outside the territorial boundaries of any state. See United States v. Smith, 18 U.S. (5 Wheat.) 153, 162 (1820) (defining piracy as "robbery upon the sea"); United States v. Yousef, 327 F.3d 56, 104 (2d Cir. 2003) (noting piracy has

been "acknowledged for at least 500 years as a crime against all nations both because of the threat that piracy poses to orderly transport and commerce between nations and because the crime occurs statelessly on the high seas"; citing Smith).[4]  Beyond the above-described limited context, acts of theft do not constitute violations of the law of nations, even if such acts are "international in scope."  See Hamid v. Price Waterhouse, 51 F.3d 1411, 1418 (9th Cir. 1995) (agreeing with Second Circuit that "the Eighth Commandment 'Thou shalt not steal'" is not part of law of nations; noting "[w]hile every civilized nation doubtless has this as a part of its legal system, a violation of the law of nations arises only when there has been a violation by one or more individuals of those standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state, and (b) used by those states for their common good and/or in dealings inter se") (quoting ITT v. Vencap, Ltd., 519 F.2d 1001, 1015 (2d Cir. 1975)).  Consequently, to the extent plaintiffs' claims of "brigandage" amount to "garden-variety" claims of receiving stolen property and theft, see Alperin, 410 F.3d at 548 (characterizing plaintiffs' remaining claims as "garden-variety legal and equitable claims for the recovery of property"), they are not cognizable under the ATS.

To the extent the terms "brigand" and "brigandage" have been characterized by commentators as synonymous with "war criminal" and "illegal warfare," plaintiffs' reliance thereon likewise is unavailing.  See Willard B. Cowles, Universality of Jurisdiction over War Crimes, 33 Cal. L. Rev. 177, 181, 194 (1945) (stating "[u]p to very recent times, the most commonly accepted, generic term for [war criminals] was 'brigand'"; noting "war crimes are very similar to piratical acts" because "[i]n both situations there is . . . a lack of any adequate judicial system operating on the spot where the crime takes place"); 2 Nuremberg Trial Proceedings 148 (opening statement of Robert H. Jackson) (Nov. 21, 1945), available

---

[4]One of the sources cited by plaintiffs confirms this analysis.  See 2 John Basset Moore, A Digest of International Law 952 (1908) (stating "as the scene of the pirate's operations is the high seas, which it is not the special right or duty of any nation to police, he is denied the protection of the flag which he may carry, and is treated as an outlaw, whom any nation may in the interest of all capture and punish").

at http://avalon.law.yale.edu/imt/11-21-45.asp (last accessed September 11, 2009) (stating "[t]he principle of individual responsibility for piracy and brigandage . . . is old and well established"; noting "[t]hat is what illegal warfare is"). Plaintiffs' claims alleging "war crimes,"[5] including claims of aiding and abetting the activities of members of the Ustasha Regime, have been dismissed. See Alperin, 410 F.3d at 559 (listing claims alleging "war crimes" and "aid[ing] and abett[ing] the activities of war criminals," including "preserving their Treasury," among nonjusticiable "War Objectives Claims").[6] Consequently, to the extent plaintiffs' claims of brigandage amount to allegations of more than acts of receiving stolen property and theft, such claims likewise fail.

Plaintiffs further argue that OFM was aware of the "atrocities" of the Ustasha Regime, and thus, OFM's assistance to such regime constitutes a violation under a "*jus cogens* analysis." (See Opp'n at 21:1-6); Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 715 (9th Cir. 1992) (holding "*jus cogens* embraces customary laws considered binding on all nations," regardless of whether state consents to such laws) (internal quotation and citation omitted). Such argument, however, is essentially identical to plaintiffs' contention that OFM aided and abetted the Ustasha Regime's war crimes, and, consequently, it fails for the same reasons.

Accordingly, plaintiffs have failed to show the Court has jurisdiction over the instant action on the basis of alleged violations of the law of nations.

//

//

---

[5] The Court notes that none of the conduct OFM is alleged to have aided and abetted, and which plaintiffs assert rises to the level of a violation of the law of nations, is alleged to have been committed other than at a time of war.

[6] The Court also notes that the position plaintiffs have taken with respect to war crimes has not been entirely consistent. In their opposition to dismissal on the ground of forum non conveniens, plaintiffs state that because OFM was "not a combatant in the Second World War [and did not] engage in organized crimes against humanity," it would not be an "appropriate defendant" in a case alleging war crimes and crimes against humanity. (See Levy Decl. ¶¶ 7-8 (stating "appropriate defendant" would be "any surviving perpetrators and the former government of the [Ustasha Regime]").)

8

## 2. Treaties of the United States

Under the United States Constitution, the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." See U.S. Const. Art. II, § 2, cl. 2. "For any treaty to be susceptible to judicial enforcement it must both confer individual rights and be self-executing." Cornejo v. County of San Diego, 504 F.3d 853, 856 (9th Cir. 2007). If a treaty is self-executing, that is, "it has the force of domestic law without the need for implementing legislation by Congress," it nonetheless will not provide a private right of action unless the language of the treaty supports such an interpretation and Congress, by its ratification, thus "intended to create private rights and remedies enforceable in American courts." See id. at 856-57 (emphasis added). Moreover, the "general rule" is that "[i]nternational agreements, even those directly benefitting private persons, [ ] do not create private rights or provide for a private cause of action." See id. at 859 (internal quotation and citation omitted).

Here, plaintiffs contend they have alleged violations of two "treaties" that provide private rights of action, specifically, the Multilateral Declaration on Forced Transfers of Property in Enemy Controlled Territory ("London Declaration"), 3 Bevans 754 (1943), 1943 U.S.T. LEXIS 188, and the Multilateral Gold Policy ("Gold Declaration"), 3 Bevans 889, 9 Fed. Reg. 2096 (1944), 1944 U.S.T. LEXIS 149. (See Sur-Reply & Response to OSC at 6:15-24.) OFM argues that neither such document is a "treaty," and that, in any event, neither document creates a private right of action. As OFM points out, neither document has been ratified by Congress. Assuming, arguendo, however, that the documents nonetheless may be deemed to constitute "treaties" for purposes of the ATS,[7] plaintiffs

---

[7] The Court notes that executive agreements, i.e., agreements entered into by the Executive Branch and one or more foreign states, although not "treaties" under Article II of the Constitution, "may in appropriate circumstances have an effect similar to treaties in some areas of domestic law" and may at times be referred to as "treaties" by Congress. See Weinberger v. Rossi, 456 U.S. 25, 30-31 & n.6 (1982). Here, neither party has addressed the question of whether Congress, in enacting the ATS, intended the word "treaty" to encompass anything other than agreements meeting the requirements of Article II.

9

1 have failed to show they meet the remaining requirements set forth above. See, e.g.,
2 Kwan v. United States, 272 F.3d 1360, 1363 (Fed. Cir. 2001) (finding executive agreement,
3 "even if viewed as a treaty, permit[ed] no private right fo enforcement by or on behalf of
4 [those] who may be its beneficiaries").

5      In the London Declaration, the signatory parties issued a "formal warning" that they
6 "intend[ed] to do their utmost to defeat the methods of dispossession practiced by the
7 governments" of the Axis powers, and "reserve[d] all their rights to declare invalid" transfers
8 of property in territories under the control of such powers. See London Declaration.  In the
9 Gold Declaration, the United States Secretary of the Treasury stated that "the United
10 States Government formally declares that it does not and will not recognize transference of
11 title to the looted gold which the Axis at any time holds or has disposed of in world
12 markets." See Gold Declaration.

13      The Court first addresses whether either the London Declaration or the Gold
14 Declaration is self-executing.  At the outset, the Court notes the text of the declarations
15 suggests that each constitutes no more than a statement of policy.  See London
16 Declaration (issuing "formal warning to all concerned"); Gold Declaration (declaring that
17 United States Government "will not recognize the transference of title" to looted gold).
18 Indeed, Altman v. Commissioner, 20 T.C. 236 (1953), on which plaintiffs rely for the
19 proposition that the London Declaration is, according to plaintiffs, "potentially self-
20 executing" (see Sur-Reply & Response to OSC at 7:25-8:6), in fact contradicts plaintiffs'
21 position.  In particular, the Tax Court in Altman found the London Declaration to be "a
22 political declaration of intent" on the part of the Allies, which "ha[d] not been carried out by
23 the Government of Austria."  See Altman, 20 T.C. at 251; see also Medellin v. Texas, 128
24 S. Ct. 1346, 1358 (2008) (finding treaty not self-executing where treaty constituted "a
25 commitment on the part of [signatories] to take future action through their political
26 branches") (internal quotation and citation omitted).

27      Even if the London Declaration and/or the Gold Declaration were deemed to be self-
28 executing, however, plaintiffs have failed to show that either document creates a private

10

right of action. Plaintiffs first argument, that the text of the London Declaration applies to both private and governmental transactions, is unpersuasive. In support of such argument, plaintiffs cite to a clause providing "[t]his warning applies whether such transfers or dealings have taken the form of open looting or plunder, or of transactions in apparently legal form, even when they purport to be voluntarily effected." See London Declaration. To the extent plaintiffs argue the distinction noted therein, between two "forms" of acquisition, reflects an intent to distinguish between, respectively, governmental and private action, plaintiffs take the clause out of context. The London Declaration expressly concerns "methods of dispossession practiced by the governments" of the Axis powers, not the actions of private individuals. See id. (emphasis added). Moreover, plaintiffs have failed to cite any authority suggesting a treaty that discusses private transactions necessarily gives rise to a private right of action concerning those transactions, and indeed, there is nothing in the text of the London Declaration to suggest such a right of action was intended thereby; rather, the declaration makes clear that it is solely a "warning." See id.

Next, plaintiffs rely on a 1949 letter in which Jack B. Tate, Acting Legal Adviser, Department of State, wrote:

> The policy of the Executive, with respect to claims asserted in the United States for the restitution of identifiable property (or compensation in lieu thereof) lost through force, coercion, or duress as a result of Nazi persecution in Germany, is to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.

(See Sur-Reply & Response to OSC App'x III ("Tate Letter") § 3.) Plaintiffs note that, in reaching this conclusion, Tate cited to the London Declaration and the Gold Declaration. (See id. § 1(a)-(b) (listing, inter alia, London Declaration and Gold Declaration as instances in which United States Government has "opposed the forcible acts of dispossession . . . practiced by the Germans").)

The Tate Letter, however, contains no language suggesting that any of the documents referenced therein creates a private right of action. Rather, the letter was written at the request of counsel for a party engaged in a federal lawsuit wherein the Second Circuit had expressed an "inability" to "pass on the validity of acts of officials of the

11

German government," see Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, 210 F.2d 375, 375-76 (2d Cir. 2004); (Tate Letter at 1), and appears to express the Executive's view that such case need not be dismissed on grounds of sovereign immunity or under the act of state doctrine, see, e.g., Republic of Austria v. Altmann, 541 U.S. 677, 688 (2007) (noting, under foreign sovereign immunity cases decided prior to passage of Foreign Sovereign Immunities Act ("FSIA") in 1976, members of international community, "as a matter of comity," had "implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases"); Liu v. Republic of China, 892 F.2d 1419, 1431-32 (9th Cir. 1989) (holding, under act of state doctrine, "the court of one country will not sit in judgment on the acts of the government of another, done within its own territory") (internal quotation and citation omitted).  Neither of these doctrines is at issue in the instant action, however, as plaintiffs do not contend OFM is a "sovereign," see Altmann, 541 U.S. at 688, or that its actions are "acts of [a] government," see Liu, 892 F.2d at 1432.

Accordingly, plaintiffs have failed to show the Court has jurisdiction over the instant action on the basis of alleged violations of any treaty of the United States.

## CONCLUSION

In sum, for the reasons stated above, plaintiffs have failed to demonstrate the Court has subject matter jurisdiction over the instant action under 28 U.S.C. §§ 1331, 1332, or 1350, and, accordingly, OFM's motion is hereby GRANTED, and the instant action is hereby DISMISSED without prejudice for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

Dated: September 11, 2009

MAXINE M. CHESNEY
United States District Judge